FILED
2015 Nov-05  AM 10:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ROBERT EARL BRADLEY,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:14-CV-02245-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant**. | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On April 20, 2011 the claimant, Robert Bradley, protectively applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act.  In both applications, the claimant initially alleged disability commencing March 15, 2011 because of aching fingertips, hypertension, digital ulcers, and peripheral artery disease. (R. 47, 53).  The Commissioner denied the claims on August 25, 2011. (R. 48, 54).  The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 26, 2013. (R. 62, 95).

In a decision dated April 16, 2013, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 12-20).  On September 23, 2014, the Appeals Council denied the claimant's request for review. (R. 1).  Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3).  The claimant has exhausted his administrative

remedies, and this court has jurisdiction pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3).  For the

reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.      whether the ALJ accorded proper weight to the opinions of the claimant's treating

physician; and

2.      whether the ALJ properly developed the record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the Commissioner's decision if she applied the correct legal standards and if substantial

evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d

1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker,* 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The

court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions...but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets the listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the

significance of certain facts, the court has no power to reverse that finding as long as substantial

evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look

only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of the evidence that detracts from the evidence relied on by

the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person

cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months...". 42 U.S.C.

§423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

    (1) Is the person presently unemployed?
    (2) Is the person's impairment severe?
    (3) Does the person's impairment meet or equal one of the specific impairments

set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next
question or, on steps three and five, to a finding of disability. A negative answer
to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must state with particularity the weight given different medical opinions, and

the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987);

*see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must give

treating physicians substantial weight, and may only credit the opinion of a consultative

physician above that of a treating physician for good cause. *Crawford v. Commissioner*, 363 F.3d

1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"Good cause" for rejecting a treating physician's testimony may include occasions when such

evidence is wholly conclusory, unaccompanied by objective medical evidence, or contradicted by

other medical evidence. *Crawford*, 363 F.3d at 1159; *Jones v. Dept. of Health & Human

Services*, 941 F.2d 1529, 1533 (11th Cir. 1991); *see also Edwards v. Sullivan*, 937 F.2d 580, 583

(11th Cir. 1991).

Additionally, the ALJ has a duty to fully and fairly develop the record. *See Lucas v.

Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990). Under the current law, the ALJ is not obligated

to recontact physicians if he finds the evidence to be inadequate. This action is now

discretionary. *See* 20 C.F.R. § 404.1520b(c)(1) (stating that the ALJ "*may* [not must] recontact

your treating physician, psychologist, or other medical source" to resolve inconsistencies or

insufficiencies in the record) (emphasis added).

## V. FACTS

The claimant was 48 years old at the time of the ALJ's final decision. (R. 29). The claimant has a tenth-grade education and past relevant work experience as a construction laborer. (R. 139). In his initial disability claim, the claimant stated that he was unable to work since March 15, 2011, because of aching fingertips, hypertension, digital ulcers, and peripheral artery disease. (R. 32).

### Physical Impairments

From 2011 to 2012, the claimant visited Cooper Green Mercy Hospital for treatment of his impairments. (R. 203-09, 259). On March 11, 2011, the claimant visited the emergency room at Cooper Green and reported an eight-to-nine month history of painful fingers with swelling and fingertip ulcerations. (R. 209). The claimant told the attending doctor, Dr. Bruce Pava, that the application of heat significantly improved his hand, while exposure to cold temperatures intensified the pain. Dr. Pava also noted that the patient smoked a half pack of cigarettes a day and consumed alcohol daily. Dr. Pava diagnosed the claimant with Raynaud's Syndrome and possible Scleroderma. (R. 209-11).

On March 23, 2011, the claimant returned to the emergency room at Cooper Green with the complaints of bilateral pain in the fingers and a history of high blood pressure. The attending doctor, Dr. Abiodun Badewa, diagnosed the claimant with cellulitis in the right index finger and hypertension. Dr. Badewa prescribed Cephalexin, an anti-bacterial drug; Naproxen, an anti-inflammatory drug; Amlodipine, to reduce claimant's high blood pressure; and Hydrochorothiazide, an additional blood pressure drug. (R. 205-08).

On April 12, 2011, Dr. Mark Wilson treated the claimant for fingertip pain at the clinic of

Cooper Green.  The clinical tests showed positive anti-nuclear antibodies.  Dr. Wilson noted the

claimant acknowledged smoking one third pack of cigarettes a day and using marijuana. (R. 204).

On May 16, 2011, the claimant returned to Cooper Green to check his hands.  At the clinic, Dr.

Ahmed Farah counseled the claimant to stop smoking. (R. 203).

        The claimant completed a function report at the request of the Social Security

Administration on May 24, 2011. In this self-assessment, the claimant indicated that he had no

problem with personal care. The claimant also stated he walked outside everyday, but did not

drive because he did not have a car. He indicated that he could walk for two or three miles before

needing to rest for five or ten minutes. The claimant stated he handled stress well. The claimant

indicated that his conditions affect the use of his hands and the ability to lift. Further, he

indicated that his impairments made it difficult to sleep because his hands ached. His daily

activities included reading and watching TV. (R. 143-53).

        On July 14, 2011, Dr. W. Curry McEvoy performed a consultative examination on the

claimant at the request of the State agency. Dr. McEvoy noted that the claimant had ulcerations

over the distal portion of multiple fingers, as well as significantly decreased range of motion in

his right index finger.  However, Dr. McEvoy also noted the claimant was able to button his shirt,

open a door, and put on his shoes. But, the claimant did show some difficulty with these actions

because of pain and decreased range of motion in his hands. Dr. McEvoy concluded the claimant

had no limitations in his ability to sit, stand, ambulate, lift or carry objects. However, Dr.

McEvoy noted the claimant should avoid performing tasks in cold environments and has

limitations in his ability to finger or perform fine manipulation with his hands. (R. 244).

        On August 23, 2011, State agency medical consultant Richard Walker, MD, completed a

physical residual functional capacity assessment on the claimant at the State agency's request. Dr. Walker did not examine the claimant in person, but completed this assessment based on the entirety of the claimant's medical records. Dr. Walker reported that the claimant could occasionally lift or carry up to fifty pounds and could frequently lift up to twenty-five pounds; could sit, stand, or walk with breaks for up to six hours in an eight-hour work day; and could push or pull, including operating hand or foot controls, without limitation. Dr. Walker further stated that the claimant should limit bilateral manipulative activities to occasional; avoid all exposure to extreme cold; and avoid concentrated exposure to wetness, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Walker determined that the claimant's symptoms of Raynaud's Phenomenon were "Greater Than Not Severe," and stated the medical evidence partially supports the alleged severity in functional limitations, and the alleged severity of the functional limitation is partially credible. (R. 245-51).

Dr. Sulaf J. Mansur treated the patient at least as early as August 24, 2011, when Dr. Mansur prescribed the claimant pain medication. (R. 264). On October 20, 2011, Dr. Mansur completed a Physical Capacities Evaluation at the request of the claimant's attorney. Dr. Mansur indicated that the claimant could only lift five pounds occasionally or less; could sit for three to four hours of an eight-hour workday; could stand and walk for three to four hours of an eight-hour workday; and did not require an assistive device to ambulate. Further, Dr. Mansur concluded the claimant could never push or pull to operate arm or leg controls; could frequently climb stairs; could never perform gross manipulation or fine manipulation of the hands and fingers; and could frequently bend, stoop, and reach.  Dr. Mansur stated the claimant could not work around dust, allergens, or fumes and could not work around hazardous machinery. (R. 254).

On the same day, Dr. Mansur also completed a Clinical Assessment of Pain at the request of the claimant's attorney. Dr. Mansur indicated that the claimant's pain was virtually incapacitating. He stated that physical activity would cause the claimant an increase of pain to such an extent that bed rest or medication would be necessary. Dr. Mansur determined the side effects of the prescribed medication would cause the clamant to be unable to function at a productive level of work. Finally, Dr. Mansur stated that the claimant's underlying medical condition is consistent with the pain he experienced. (R. 255-56).

On the same day, Dr. Mansur also completed a Clinical Assessment of Fatigue/Weakness form at the request of the claimant's attorney. In the assessment, Dr. Mansur concluded that the claimant experienced fatigue and weakness to such an extent as to negatively affect adequate performance of daily activities and that physical activity would greatly increase fatigue and weakness to cause total abandonment of tasks. Further, the treating doctor stated that the side effects of prescribed medication could be expected to be severe and limit effectiveness caused by distraction, inattention, and drowsiness. (R. 257-58).

On November 14, 2011, the claimant visited Dr. Ahmed Farah at Cooper Green complaining of right index finger pain. The claimant told Dr. Farah he experienced a pain level of eight out of ten. Dr. Farah noted that the finger showed signs of gangrene and autoamputation. Dr. Farah told the claimant to stop smoking. (R. 265).

On November 22, 2011, the claimant saw Dr. Mansur for a routine visit. During the visit, the claimant told Dr. Mansur that he experienced a pain level of four out of ten. Dr. Mansur also noted that the claimant's finger looked much better. (R. 264). On November 28, 2011, the claimant visited Laura Hughes, MD. The claimant told Dr. Hughes that he experienced a pain

level of three out of ten. Dr. Hughes noted that the claimant had not refilled his prescriptions

because of his financial issues. Dr. Hughes counseled the claimant to stop smoking. (R. 263).

The claimant returned to the emergency room at Cooper Green on February 15, 2012

complaining of bilateral hand pain. Willard Mosier, MD treated the claimant. During the visit,

the claimant described the severity of his pain to Dr. Mosier as, "moderate, severe, similar to last

episode." Dr. Mosier noted that the claimant had not stopped smoking. The doctor told the

claimant to return to the emergency room for worsening symptoms, follow up with his regular

doctor, and to stop smoking. (R. 259-60).

*ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental social security

income, the claimant requested and received a hearing before an ALJ on March 26, 2013. (R. 48-

58, 66). At the hearing, the claimant testified that he quit work because it irritated his hands. (R.

32).  The claimant explained that both of his hands were irritated, and that his fingertips would

swell up and ache.  He stated that he was unable to pick up heavy objects, and, therefore, was

unable to work.

The claimant explained that his hands had been in this condition for about two years; that

he is right handed; and that his right thumb, index finger, and middle finger were swollen.  He

described the tip of his right index finger as "rotted off," with no fingernail; his fingers on his left

had as inflamed; and his hands as "busted up." (R. 34-35). The claimant told the ALJ that he

could lift a gallon of milk with one hand; could carry a bag of donations into a shelter; and could

perform activities with his hands for five to ten minutes, after which a "sharp pain" would go

through his hands. (R. 36).

The ALJ questioned the claimant about his smoking history.  The claimant stated that he

had tried to quit, but still smoked one half pack of cigarettes a day. (R. 33). The claimant stated

that his doctor told him not to smoke, and that, if he did not quit, his fingers would rot off. (R.

36).  The claimant had last consumed alcohol three days before the hearing, and claimed to drink

socially.  He stated he no longer used illegal drugs, and last used crack cocaine two to three

months before the hearing. (R. 34).

The claimant is a homeless man and spends his time in a shelter and on the streets. He

gave the court his mother's address but does not stay there. (R. 29). He testified that, on a typical

day, he walks around and spends time at the library.  He stated that he reads books at the library

but does not use the computers because he did not know how. (R. 30).   He stated that he had

never possessed a driver's license because he does not drive. (R. 31).

The claimant testified he spent time at the Firehouse, a local shelter.  He stated he would

eat and sleep at the shelter and would help around the shelter occasionally. (R. 30-31).  He would

wipe down tables and help bring bags in; however, he claimed the activities aggravated his

hands.  He could assist for ten minutes before the use of his hands became too painful. (R. 35).

The claimant stated that he last received medical care from Cooper Green Hospital in

February, 2012. (R. 36). He believed the hospital was in the process of closing down.  He

stopped seeking medical care at Cooper Green because he had to pay $5.00 for non-emergency

treatment.  He stopped receiving care because he wasn't working and did not have the money.

The doctors at Cooper Green told him that he had high blood pressure and suffered from

migraines, but he was unable to afford medication for treatment. (R. 37).

Before the hearing, the claimant stated that he was last employed in 2011. He worked as a

construction laborer tying steel. In 2011, he quit his job because of the pain in his hands.  He

claimed he could no longer work in cold weather, and lifting heavy objects irritated his hands.

He did not seek unemployment because he did not believe he was eligible after quitting his job.

(R. 32).

A vocational expert, Dr. William Green, testified concerning the type and availability of

jobs that the claimant was able to perform. (R. 39). He described the claimant's past work as a

construction laborer as very heavy in exertion and unskilled. The ALJ asked Dr. Green to assume

a hypothetical person who was the claimant's age, education, and work experience with the

residual functional capacity to perform medium work, with the following limitations: can

occasionally finger bilaterally; can frequently handle; must avoid concentrated exposure to cold

and wetness; and must avoid hazardous machinery and unprotected heights.  Dr. Green stated

that such a person could not perform the claimant's past work. (R. 39-40).

The ALJ asked Dr. Green if any jobs existed in the national economy that the

hypothetical person could perform. Dr. Green  responded with three example jobs that such a

person could perform: conveyor attender, with 3,000 jobs in Alabama and 175,000 nationally;

business cleaner, with about 4,000 jobs in Alabama and 300,000 nationally; and light cleaning

jobs, particularly house cleaners, with 3,000 jobs in Alabama and 220,000 nationally. Dr. Green

testified that the first two job examples were considered "medium, unskilled" work, while the

last example was "light" work. (R. 40).

The ALJ also asked Dr. Green to assume the same limitations that were provided in the

first hypothetical; however, the individual may only occasionally handle bilaterally. Dr. Green

stated that the additional limitation "substantially erodes the occupational base."  He clarified

that a few jobs existed that the hypothetical person could perform, such as usher jobs, but very

few in Alabama.  He testified that very few light, medium, or sedentary jobs existed in Alabama.

(R. 41-42).

*The ALJ's Decision*

On April 16, 2013, the ALJ issued a decision finding that the claimant was not disabled

under the Social Security Act. (R. 21). First, the ALJ found that the claimant met the insured

status requirements of the Social Security Act through December 31, 2016, and had not engaged

in substantial gainful activity since his amended alleged onset of March 15, 2011. (R. 14).

Next, the ALJ found that the claimant had severe impairments of Raynaud's Syndrome,

Berger's Disease, Scleroderma, and tobacco abuse. The ALJ further noted the existence of non-

severe impairments of hypertension and carpal tunnel syndrome. Although the claimant's treating

physician suggested that the claimant may have peripheral vascular disease, the ALJ found no

objective medical evidence to support this impairment and found it not medically determinable.

Further, the ALJ noted that the claimant's severe and non-severe impairments did not,

singly or in combination, meet or medically equal the severity of a listed impairment. (R. 15). In

making this finding, the ALJ considered the relevant listings corresponding to the claimant's

severe impairments.  The ALJ found no medical evidence within the record that documented

listing-level severity, either individually or in combination. (R. 15).

After considering the entire record, the ALJ found that the claimant has the residual

functional capacity (RFC) to perform "medium work" as defined in 20 C.F.R. 404.1567(c) and

416.967(c), with the following limitations: can occasionally finger bilaterally; can frequently

handle; must avoid concentrated exposure to cold and wetness; and must avoid hazardous

machinery and unprotected heights.

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record.  The ALJ concluded that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not fully credible.  The ALJ found that the claimant's treatment records failed to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled. (R. 16).

The ALJ stated that the claimant's failure to comply with medical advice undermined his allegations as to the debilitating nature of his hand impairments.  Specifically, the claimant did not stop smoking despite numerous doctors' orders to quit.  Additionally, the claimant testified that he stopped receiving medical treatment in February 2012 because he did not have the money to pay the $5 copay.  However, the ALJ noted that the claimant smoked half-a-pack of cigarettes a day, consumed alcohol three days before the hearing, and admitted to smoking crack two to three months prior to the hearing. The ALJ stated that this information undermined the claimant's statement that he could not afford medical treatment. Therefore, the ALJ found the claimant's allegations of severe pain not fully credible because of his noncompliance with medical advice. (R. 16-17).

The ALJ gave some weight to the opinion of the State agency medical consultant Richard Walker, MD.  The ALJ noted that Dr. Walker's opinion generally was consistent with the medical record when considered in its entirety.

However, the ALJ found Dr. Walker's limitations on the claimant's exposure to fumes,

odors, dusts, gases and poor ventilation were not supported by objective medical evidence. The

ALJ noted that the claimant's medical history contains no evidence of any respiratory issues, or

that pulmonary irritants cause any exacerbation of his impairments. Further, the ALJ noted that

during the consultative examination, the claimant demonstrated no limitation in his ability to lift

or carry objects. The ALJ found the claimant did show limitations in his ability to finger and

perform fine manipulation during the consultative examination. (Ex. 3F).  Therefore, the ALJ

limited the claimant's RFC to frequent handling and occasional fingering. (R. 17).

The ALJ gave some weight to the opinion of consultative examiner Dr. McEoy. The ALJ

agreed with Dr. McEvoy's opinion that the claimant may be limited in performing tasks in cold

environments and limited in the ability to finger or perform fine manipulation.  Therefore, the

ALJ found that the claimant was limited to medium work and had environmental and

manipulative limitations.

The ALJ gave little weight to the opinion of the claimant's treating physician, Dr. Sulaf

Mansur because it was inconsistent with the objective medical evidence.  Further, treatment

notes from the claimant's examination did not correspond with the degree of limitations

suggested.

The ALJ gave little weight to Dr. Mansur's opinion that the claimant could lift five

pounds or less; could sit and stand for three hours total; and could never engage in pushing and

pulling.  The ALJ noted that the claimant stated at the hearing that he could lift a gallon of milk

with both hands. The ALJ also referenced the claimant's testimony that he helps out at a shelter,

carrying bags and wiping tables. The ALJ found that during the claimant's consultative

examination, the claimant could button his shirt and open the door, but showed some difficulty

performing the tasks. The ALJ believed that these activities were inconsistent with the level of limitations Dr. Mansur suggested; therefore, the ALJ found this evidence did not support Dr. Mansur's finding that the claimant could never engage in gross or fine manipulations.

The ALJ found that the claimant was unable to perform any past relevant work. In making this determination, the ALJ relied on the testimony of the vocational expert at the ALJ hearing.  The vocational expert testified that a hypothetical person with the claimant's age, education, work experience, and residual functional capacity would be unable to perform his past job as a construction laborer.  Therefore, the ALJ concluded the claimant could not perform any past relevant work. (R. 18).

Finally, the ALJ determined, based on the vocational expert's testimony, that jobs existed in the national economy that the claimant could perform. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 19).

## VI. DISCUSSION

The claimant argues that the ALJ should have given greater weight to the opinion of a treating physician, and that the ALJ failed to develop the record. To the contrary, this court finds that the ALJ applied the appropriate legal standards in his evaluation of the opinions of the physicians and the record as a whole, and that substantial evidence supports the ALJ's findings.

*Issue 1: The ALJ's Assessment  of the Treating Physicians' Opinions*

The claimant argues that the ALJ failed to accord proper weight to the opinion of the claimant's treating physician, Dr. Mansur. This court finds that the ALJ properly articulated his reasons for giving little weight to the opinion of Dr. Mansur and that substantial evidence supported these reasons.

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford*, 363 F.3d at 1159. Good cause exists when (1) the treating physician's opinion was not consistent with the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records. *Id*. As discussed below, all three examples are present in this case; thus, the ALJ had good cause to discount Dr. Mansur's opinion.

First, Dr. Mansur's opinion was not supported by by the evidence. In October 2011, Dr. Mansur opined that the claimant could lift five pounds or less; sit or stand for three to four hours total; never engage in pushing or pulling; never engage in gross or fine manipulation, and other limitations. After carefully considering the record, the ALJ found no objective medical evidence to support Dr. Mansur's level of limitations, stating that "the claimant's treatment records fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled." (R. 16). The record contains several other physicians that examined the claimant, none of whom recommend limiting the claimant's activity to the level Dr. Mansur suggests. While giving the majority of Dr. Mansur's opinion little weight, the ALJ did find the limitation on gross and fine manipulation to be supported by the evidence. Therefore, the ALJ appropriately limited the claimant's RFC to medium work with occasional fingering bilaterally and frequent handling.

Second, substantial evidence supports the ALJ's finding that Dr. Mansur's opinion is inconsistent with the objective medical evidence because the evidence supports a contrary finding. The ALJ noted that, at the hearing, the claimant testified he could lift a gallon of milk with two hands; help a local shelter by carrying bags and wiping down tables; and continued to

smoke. These activities do not correspond with the heavy limitations of Dr. Mansur's opinion.

Further, the ALJ gave some weight to the opinion of consultative examiner Dr. McEvoy that

found the claimant had no exertional or postural limitations. The ALJ found Dr. McEvoy's

opinion supported a finding of not disabled, contrary to the limitations Dr. Mansur's opinion

suggests. Thus, substantial evidence supports the ALJ's decision to discount the weight given to

the treating physician's opinion.

Finally, Dr. Mansur's opinion was conclusory or at least inconsistent with his own

medical records. The ALJ explained that the treating physician's treatment notes do not

correspond to the degree of limitations suggested. For example, Dr. Mansur prescribed the

limitations by checking boxes on a form at the request of the claimant's attorney. (R. 254-258).

The record contains no treatment notes to corroborate the treating physician's selections on the

form. Rather, as the ALJ determined, the limited treatment notes that exist are inconsistent with

the treating physician's October, 2011 opinion. For example, Dr. Mansur's opinion described the

claimant's  pain as "intractable and virtually incapacitating." (R. 255). However, in his treatment

records, Dr. Mansur noted that the claimant indicated a pain level of four out of ten. (R. 264).

Further, while treating the claimant, Dr. Mansur ordered his patient to stop smoking, but made no

such limiting instructions regarding the claimant's physical activity. Therefore, substantial

evidence supports the ALJ's determination that Dr. Mansur's treatment notes did not correspond

with his opinion.

The ALJ showed good cause for not giving the treating physician's opinion substantial

weight. Therefore, the ALJ applied the proper legal standard and substantial evidence supports

the ALJ's decision to give Dr. Mansur's opinion little weight.

*Issue 2: Whether the ALJ Properly Developed the Record*

Finally, the court concludes that the ALJ did not fail to fully develop the record by not

obtaining any additional medical testimony, whether it was from Dr. Mansur, a medical expert,

or an additional consultative examiner. The ALJ has an obligation to develop a full and fair

record, even if the claimant is represented by counsel. *Nation v. Barnhart* 153 F. App'x 597, 598

(11th. Cir. 2005). However, the claimant always bears the ultimate burden of producing evidence

to support his disability claim. *See Ellison v. Barnhart*, 355 F. 3d. 1272, 1276 (11th Cir. 2003).

The ALJ found sufficient evidence in the record to make a determination about the

claimant's RFC. The record contained the medical notes of multiple physicians who had treated

the patient. The ALJ was not obligated to recontact physicians whose opinions were inconsistent

with the record or seek any further medical consultation. The Social Security regulations provide

that the ALJ "*may* [not must] recontact a treating physician, psychologist, or other medical

source" to resolve inconsistencies or insufficiencies in the record. 20 C.F.R. § 404.1520b(c)(1)

(emphasis added). As such, the ALJ did not err in failing to recontact the claimant's treating

physician. Therefore, the court finds that the ALJ applied the proper legal standard and

substantial evidence supports the ALJ's determination of the claimant's RFC.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ applied the proper legal

standard and substantial evidence supports the Commissioner's decision. Accordingly, this court

AFFIRMS the decision of the Commissioner.

The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 5th day of November, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE